# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-881V
**Filed: June 25, 2019**
(Not to be published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JODI EADS, | |
| Petitioner, | Findings of Fact; Onset; |
| | Chronic Inflammatory Demyelinating |
| v. | Polyneuropathy ("CIDP"). |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Shealene Mancuso*, Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Traci Patton*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ONSET[1]

**Oler**, Special Master:

On June 28, 2017, Jodi Eads ("Ms. Eads" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). The petition alleges that the influenza ("flu") vaccination Ms. Eads

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

received on September 26, 2015 caused her to suffer from chronic inflammatory demyelinating polyneuropathy (CIDP). Pet. at 1.

During the pendency of this matter, Petitioner submitted one affidavit that she authored, along with affidavits prepared by her husband, her daughters, several work associates, and her best friend, as well as other documentary evidence. The facts Petitioner presented in her affidavits relating to the onset of her medical symptoms differed from those documented in some of Petitioner's medical records. When discrepancies exist between medical records and affidavits, "Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing." *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006).

Accordingly, I held a hearing on March 6, 2019, by video teleconference ("VTC") in Washington, DC, to determine the date of onset of Petitioner's hand tingling and numbness. Ms. Shealene Mancuso appeared on behalf of Petitioner and Ms. Traci Patton appeared on behalf of Respondent. I heard testimony via VTC from Petitioner, her friend, Sherry McCullough, her supervisor, Sarah Wolfe, and her daughter, Chelsie Sharp.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and documentary evidence, I find that Petitioner's numbness and tingling in her hands began on approximately October 21, 2015.

**I. Procedural History**

On June 28, 2017, Petitioner filed a petition alleging that she suffered from CIDP as a result of a flu vaccine administered on September 26, 2015. Petition, ECF No. 1. Petitioner filed medical records on June 29, 2017. Exs. 1, 2, 3, 4, 5, 6. Petitioner filed several affidavits, including her own on June 29, 2017. Exs. 7, 8, 9, 10.

On March 21, 2018, Respondent filed a Rule 4(c) Report. ECF No. 15. Respondent states that Petitioner has not provided evidence that satisfies her burden of proof under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005), specifically noting that none of Petitioner's treating physicians attributed her CIDP to the flu vaccine. Resp's Rept. at 8. Respondent further states that Petitioner has not shown a proximate temporal relationship between the vaccine and onset of symptoms. *Id.* While Petitioner contends her symptoms began in October 2015, "the medical records support a finding that the onset of her condition was either well before the vaccination, or, most likely, in December 2015, more than 10 weeks after the vaccination." *Id.*

On February 1, 2019, Petitioner submitted a movie ticket from January 8, 2016 (Ex. 12), an affidavit from Amy Rumschlag (Ex. 13), an affidavit from Cindy Gallmeyer (Ex. 14), an affidavit from Sarah Wolfe (Ex. 15), an affidavit from Martha Pimentel (Ex. 16), an affidavit from Natasha Braun (Ex. 17), and an affidavit from Sherry McCullough (Ex. 18).

On February 21, 2019, Petitioner filed her husband's hospital discharge summary. Ex. 19. On February 26 and 27, 2019, Petitioner filed staff development notes from her place of employment. Exs. 20, 21. On March 20, 2019, Petitioner filed additional medical records. Ex.

22.

      I conducted a fact hearing on March 6, 2019 in Washington, DC.  Petitioner filed several documents after the fact hearing, to include Dr. Gresla's phone messages (Ex. 23), Facebook posts (Ex. 24), and family home visit supervision notes from September 1, 2015 through December 31, 2015 (Ex. 25).  I held a status conference with the parties on May 30, 2019 to clarify that the date of the home visit in the family home visit supervision notes (Ex. 25 at 1).  In order to address this issue, Petitioner filed a supplemental affidavit by Ms. Wolfe.  Ex. 26.  The parties indicated they had no further evidence to present during the status conference on May 30, 2019.  The matter is now ripe for adjudication.

**II. Petitioner's Medical Records**

      Petitioner was born in 1970.  She was 45 years old on September 26, 2015, when she received the allegedly causal flu vaccination in her left deltoid at Adams Memorial Hospital in Decatur, Indiana.  Ex. 1 at 3-4.

    **A.  Petitioner's Medical History Prior to the Flu Vaccination**

      On August 21, 2015, Petitioner presented to her primary care physician, Dr. Gresla for fatigue and anxiety.  Ex. 2 at 11.  She had a medical history significant for elevated triglycerides, vitamin D deficiency, fatigue, anxiety, hypothyroidism, and borderline diabetes.  *See* Ex. 2 at 9.  Ex. 3 at 65.

    **B.  The Flu Vaccination and Petitioner's Subsequent Medical History**

      After receiving her flu vaccination on September 26, 2015, Petitioner did not seek medical care until January 13, 2016.  On this date, she presented to her primary care physician complaining of numbness and tingling.  Ex. 2 at 15.  The records from this visit state that "the numbness and tingling has been sudden and has been occurring for 3 weeks."  *Id.*  Petitioner described the symptoms as occurring in her hands and feet, and that sometimes she has sharp shooting pains in her feet.  *Id.*  The records further indicate that "the numbness started around 8 months ago but has been worse since Dec. 2, 2015."  *Id.*  In the "Review of Systems" section of this record, under "Gastrointestinal" it states, "Present – Constipation (Present before but worse since onset of other symptoms on December 12)."  *Id.* at 16.

      Petitioner visited Dr. Yu Liu, a neurologist, on January 20, 2016.  *See* Ex. 3 at 65.  The notes from this visit state the reason for consultation was "bilateral hand numbness [which] started in 10/2015, subjective feeling of leg weakness."  *Id.*  The notes further indicate "she has a clear cut onset of the symptoms.  She described that on 12/10/2015 she was taking a shower and suddenly felt bilateral finger numbness and upper extremity numbness, and she also felt leg weakness bilaterally starting at that time."  *Id.*  Dr. Liu indicated that he wanted Petitioner to have an electromyography nerve conduction study (EMG/NCS) performed in order to help elucidate the diagnosis.  *Id.* at 66.

      The EMG/NCS showed "significant slowing in both motor and sensory, in both arms and

3

leg … pointing to the possibility of Acute Inflammatory Demyelinating Polyneuropathy." Ex. 3 at 54.

Petitioner followed up with Dr. Liu on February 2, 2016. Ex. 3 at 55. The history of present illness section states, "[t]he patient is a 45-year-old female, who has a subjective feeling of tingling and numbness in the arm and leg, with later on weakness that started 12/10/2015, with a clarification. I incidentally [sic] dictated the [sic] 10/2015 last time." *Id.* Based on the EMG/NCS results, Dr. Liu believed Petitioner was suffering from Guillain Barré syndrome "that was probably already past the 4-week acute phase." *Id.*

On March 2, 2016, Petitioner's physical therapy notes indicate that "Pt. reports first experiencing symptoms of Guillain Barre on December 10th." Ex. 3 at 349.

Petitioner returned to see Dr. Liu on March 14, 2016. Ex. 3 at 30. Dr. Liu describes the history of present illness as follows,

> The patient is a 45-year-old female who started to have the symptom of weakness, 12/10/2015. She was first seen by me on 01/20/2016. At that time, she had bilateral hand numbness and stated it started in 10/2015 and the subjective feeling of leg weakness. In any case, that is already six weeks even counting on 12/10 as the starting date of the symptom, but she said the symptom numbness can go back to October per initial note.
>
> …
>
> After discussing the syndrome, we decided together with the patient that the [sic] we hold on IVIG or plasmapheresis because it is 6 to 8 weeks beyond when the symptoms started, even counting 12/10/2015, as the latest start.

*Id.*

Petitioner was admitted to Adams Memorial Hospital on March 14, 2016 to receive five days of IVIG treatment. Ex. 3 at 552. The history of present illness section from that record states,

> [a] 45-year-old female who started having symptoms of weakness, and numbness, mostly in bilateral hands, and stated it started in 10/2015, with subjective feeling of leg weakness. At that point it was 6 weeks after the date by the time she was first seen by Dr. Liu on 01/20/2016[3]…
>
> …

---

[3] This is not accurate. Six weeks before January 20, 2016 is December 9, 2015.

> The patient and husband cannot define any prodromal symptoms of a viral illness or other infection that precipitated this neuropathy. She did receive a flu shot, but this was after it started in November.[4]

*Id.*

On March 30, 2016, Petitioner again visited Dr. Liu.  Ex. 3 at 22.  Dr. Liu noted that Petitioner "has symptoms that started in 12/2015." *Id.*

Petitioner followed up with Dr. Liu on May 23, 2016.  Dr. Liu summarizes her history of present illness as follows, "[i]t started 12/10/2016.  She was feeling tingling and numbness in the extremities including arm and later on, leg.  She described pinprick sensation.  She had subjective leg weakness initially.  She still carries on her employment and worked 6 weeks after symptoms started." *Id.*

On June 10, 2016, Petitioner saw Dr. Kerry Levin at the Cleveland Clinic.  The medical records from this visit indicate that Petitioner "was in good health until October, 2015, several weeks after a flu vaccination, when she developed a feeling of weakness in the legs, followed by a sense of numbness in the fingertips in December, 2015." Ex. 4 at 6.

Although there are additional medical records after this date, they do not assist with my determination regarding onset.

### III. The Petition, Affidavits, and Documentary Evidence

The Petition filed in this matter states that Petitioner experienced CIDP following her September 26, 2015 flu vaccination.  Petition at 1.

#### A. Affidavits

##### 1. Affidavit of Ms. Jodi Eads

In support of her Petition, Ms. Eads signed her affidavit on June 12, 2017.  In it, she states that her husband was admitted to the hospital on October 28, 2015 for heart surgery.  Ex. 7 at 1.  Petitioner stated that "approximately one week prior to his hospital admission, I began experiencing tingling, pins and needles, and numbness in my fingers, difficulty typing and washing my hair, and tingling in my hands." *Id.*  She assumed these symptoms were due to the stress of her husband's upcoming surgery or possible carpal tunnel syndrome. *Id.*

Petitioner stated that in November 2015, she experienced increased tingling in her hands and fingers, and tingling and weakness in her legs. *Id.*  Her symptoms became worse in December 2015. *Id.*

##### 2. Affidavit of Ms. Alyssa Keipper

---

[4] This is inaccurate; Petitioner received her flu vaccine on September 26, 2015.

5

Ms. Keipper is Petitioner's oldest daughter. She signed her affidavit on June 23, 2017. In the document, Ms. Keipper stated that before her vaccination, Petitioner never complained of pain or difficulty using her arms, hands, feet, or legs. Ex. 8 at 1. Ms. Keipper stated that sometime between Halloween and Thanksgiving of 2015, she used exercise weights with Petitioner. *Id.* Petitioner dropped a three-pound weight when they were working out. *Id.*

Ms. Keipper stated that in December 2015 the family went bowling. *Id.* When Petitioner tried to bowl she was unable to hold the bowling ball and dropped it. *Id.*

### 3. **Affidavit of Ms. Chelsie Sharp**

Ms. Sharp signed her affidavit on June 23, 2017. Ms. Sharp is Petitioner's youngest daughter. Ex. 9 at 1. Ms. Sharp stated that her father had heart surgery in October of 2015. *Id.* While Ms. Sharp was in the hospital with Petitioner, Petitioner said her hands were bothering her, but that she didn't have time to worry about it because Mr. Eads was recovering from surgery. *Id.*

Ms. Sharp discussed the difficulties Petitioner has faced with her condition. *Id.* at 2. Petitioner cannot open medication bottles, button her pants, and sometimes has difficulty standing up after being seated. *Id.*

### 4. **Affidavit of Mr. Doug Eads**

Mr. Doug Eads, Petitioner's husband, signed his affidavit on June 23, 2017. Mr. Eads stated that he had heart surgery in late 2015. Ex. 10 at 1. Shortly after his recovery, Petitioner was having problems with "weakness and different sensations in her limbs." *Id.* Mr. Eads discussed the difficulty of dealing with his medical situation and how his wife's diagnosis has added uncertainty to their future. *Id.* at 2.

### 5. **Affidavit of Ms. Amy Rumschlag**

Ms. Rumschlag signed her affidavit on January 28, 2019. In it, she states that she has worked with Petitioner for the past 18 ½ years, and that she associates with her both in and outside of the workplace. Ex. 13 at 1. Ms. Rumschlag states that before her vaccination, Petitioner never complained about difficulty using her arms or hands, or difficulty walking. *Id.* Ms. Rumschlag averred that in early to mid-November 2015, she saw Petitioner frequently rub her hands and say that they hurt. *Id.* In December 2015, Petitioner told Ms. Rumschlag that her arms were weak when she washed her hair in the shower. *Id.* Before Christmas break, Petitioner had difficulty getting into the office. *Id.* Ms. Rumschlag stated that when Petitioner returned to the office after the Christmas break, she had trouble with all activities of daily living. *Id.* at 2.

### 6. **Affidavit of Ms. Cindy Gallmeyer**

Ms. Gallmeyer signed her affidavit on January 29, 2019. In it, she states that she has worked with Petitioner for the past 18 years, and that she has both a personal and a professional relationship with her. Ex. 14 at 1. Ms. Gallmeyer states that before her vaccination, Petitioner never complained about difficulty using her arms or hands or difficulty walking. *Id.* Ms.

Gallmeyer remembers a co-worker telling her that Petitioner fell sometime in December of 2015. *Id.* Ms. Gallmeyer states that Petitioner was not able to complete her paperwork and that their supervisor had to go to Petitioner's house and help her due to Petitioner's pain, numbness, and tingling in her hands. *Id.* Petitioner also complained to Ms. Gallmeyer that she was having trouble using the bathroom, showering, and styling her hair. *Id.*

### 7. Affidavit of Ms. Sarah Wolfe

Ms. Wolfe signed her affidavit on January 29, 2019. Ms. Wolfe stated that she has worked with Petitioner for nearly 20 years and that she has been Petitioner's direct supervisor at Adams County Healthy Families since July of 2000. Ex. 15 at 1. Ms. Wolfe stated that she observed Petitioner become progressively weaker and exhibit slower-than-normal work from October to early December 2015. *Id.* Ms. Wolfe also described that she had to sporadically help Petitioner enter paperwork during their weekly supervision meetings throughout the month of November 2015. *Id.* According to Ms. Wolfe, by the end of December 2015, Petitioner expressed that she did not want to take on new clients because she was concerned that she would not be able to walk up the steps to their houses. *Id.*

Ms. Wolfe stated that after Christmas of 2015, she observed a "deep decline" in Petitioner's functioning. *Id.* Because of this, Ms. Wolfe had to go to Petitioner's house to help enter paperwork. *Id.* In January, it became clear there was something very medically wrong with Petitioner. *Id.*

### 8. Supplemental Affidavit of Ms. Sarah Wolfe

Ms. Wolfe signed a second affidavit at my request, in order to clarify the date of one specific home visit in the family home visit supervision notes. In this affidavit, Ms. Wolfe describes the home visit dates from exhibit 25, page 1, which she states took place on October 20, 2015, and November 12, 2015. Ex. 26 at 1. In other words, exhibit 25, page 1 summarized visits from two different dates. She states in her affidavit that she discussed these visits with Petitioner on November 18, 2015. *Id.* Specifically, Ms. Wolfe discussed Petitioner having trouble getting off the floor and how she was feeling regarding leg weakness. *Id.* The affidavit did not clarify whether Petitioner had trouble getting off the floor on October 20, 2015, November 12, 2015, or whether this occurred on both occasions. *See Id.*

### 9. Affidavit of Ms. Martha Pimental

Ms. Pimental signed her affidavit on January 31, 2019. In it, she states that she has worked with Petitioner for the past 19 years, and that she has both a personal and a professional relationship with her. Ex. 16 at 1. Ms. Pimental avers that Petitioner's husband had surgery in October of 2015, and that she remembers Petitioner complaining of tingling and pain in her hands in mid to late November 2015. *Id.* Ms. Pimental states that Petitioner was not able to complete her paperwork and that their supervisor had to help her. *Id.* She also stated that Petitioner fell a couple of times while at work, and that eventually their employer had to install a cement step so Petitioner could get into the office. *Id.*

### 10. Affidavit of Ms. Natasha Braun

Ms. Braun signed her affidavit on January 28, 2019. In it, she states that she has worked with Petitioner for the past 18 years, and that she has both a personal and a professional relationship with her. Ex. 17 at 1. Ms. Braun states that Petitioner did not begin complaining of numbness, tingling, pain, or weakness in her extremities until mid to late November of 2015. *Id.* She described having conversations with Petitioner where Petitioner complained about tingling and pain in her hands. *Id.* According to Ms. Braun, Petitioner continued to complain about her hands in December 2015. *Id.*

### 11. Affidavit of Ms. Sherry McCullough

Ms. McCullough signed her affidavit on January 31, 2019. In this document, she describes herself as Petitioner's friend for the past ten years, and best friend for the past eight years. Ex. 18 at 1. According to Ms. McCullough, Petitioner spoke with her during the October 2015 through January 2016 timeframe about Petitioner's decreasing physical strength. *Id.* Petitioner also discussed the fact that her hands would tingle and become numb. *Id.* Ms. McCullough stated that Petitioner came to her (Ms. McCullough's) November 29, 2015 anniversary party. *Id.* During the party, Petitioner told Ms. McCullough that she was worried she would not be able to get up on her own after being seated. *Id.*

Ms. McCullough stated that she and Petitioner and Petitioner's husband went to see the movie "The Revenant" on January 8, 2016. *Id.* Petitioner's husband had to help Petitioner get out of her seat at the theater because Petitioner could not get up on her own. *Id.* Ms. McCullough stated that Petitioner is not a person who typically complains about things. *Id.* at 2.

### B. Documentary Evidence

Petitioner filed a copy of a movie ticket for "The Revenant", that she attended in January 2016. Ex. 12. She also filed her husband's discharge summary from the hospital, indicating that he was discharged on November 3, 2015. Ex. 19. Petitioner filed staff development notes written by her supervisor, Sarah Wolfe. Exs. 20, 21. She filed records of phone messages from her primary care physician, Dr. Gresla. (Ex. 23), Facebook posts (Ex. 24), and family home visit supervision notes from September 1, 2015 through December 31, 2015 (Ex. 25).

### C. Testimony at the Hearing

#### 1. Testimony of Petitioner

Petitioner testified that her husband was admitted to the hospital for heart surgery on October 28, 2015. Tr. at 10; *See* Ex. 19. Petitioner stated that she began experiencing tingling, pins and needles, and numbness in her fingers, difficulty typing and washing her hair, and tingling in her hands approximately one week before he was admitted. *Id.* She did some research on the internet and thought she might have carpal tunnel syndrome. *Id.* at 13. Petitioner also thought her symptoms could be caused by stress. *Id.* She mentioned her numbness and tingling to some of

her co-workers before her husband was admitted to the hospital. *Id.* While she was in the hospital, she also spoke about her symptoms with her daughter, Chelsie. *Id.* at 15.

During this same time, Petitioner's brother-in-law (her husband's brother) died from a heart attack at age 49. Tr. at 11. According to Petitioner, because of her husband's serious health condition as well as his brother's death, she did not feel like it was the appropriate time to make her numb/tingling fingers a priority. *Id.* at 16-17.

Petitioner was in the hospital with her husband for about one week while he recovered from surgery. Tr. at 10. During this time, she testified that she began to experience symptoms with her legs. *Id.* at 17-18. According to Petitioner, her feet felt like they were falling asleep. *Id.* at 18. She also noticed that she had difficulty standing up after she used the bathroom in the hospital. *Id.* During this week, the tingling in her hands and fingers increased in severity. *Id.* She testified about trying to type on her work laptop and noticing that her hands "just were not wanting to cooperate." *Id.* Her husband was discharged from the hospital on November 3, 2015, and Petitioner went back to work on November 7, 2015. *Id.* at 19.

Petitioner testified that she experienced some difficulties when she got back to work. Tr. at 19. Specifically, she described a home visit shortly before Thanksgiving 2015 where she was on the ground conducting an activity with a child and when it came time for her to leave, she was unable to stand up from the floor. *Id.* at 19-20.

Petitioner also described the challenge she faced in going up and down the stairs to her clients' homes. Tr. at 22. If they did not have railings, Petitioner testified the clients would have to come out and help her up the steps. *Id.* She became unable to sit on the floor with the children and instead had to stand for the entire home visit. *Id.* Her office put in a cement step outside one entrance to the office so Petitioner could get inside the front door. *Id.* at 24. This took place in late November or early December 2015. *Id.*

In December of 2015, Petitioner testified that her symptoms continued to worsen. One day in December she was coming in to the office and she fell because her legs gave out. Tr. at 26. According to Petitioner, it took about 30 minutes to get up off the ground. *Id.* at 26-27.

Petitioner testified that she tried to make a medical appointment with Dr. Gresla in December of 2015, but when she called, she learned that Dr. Gresla was in the process of moving his office and would be unavailable for appointments for two to three weeks. Tr. at 32-33.[5] Dr. Gresla has been Petitioner's primary care doctor for nearly 24 years. *Id.* at 54.

Petitioner described several medical appointments whose records indicate that she began experiencing onset of symptoms starting in December 2015, as inaccurate. *See* Tr. at 29-31. She testified that she told her doctors her symptoms started in October 2015 and worsened in December. *Id.* at 31, 38. With respect to the physical therapy records, Petitioner testified that no one from physical therapy ever took a history from her, and she assumes they took that information from her medical records. *Id.* at 83-84.

---

[5] Petitioner filed records of phone messages received by Dr. Gresla after the conclusion of the hearing. There is no record that Petitioner called to try to schedule an appointment in December 2015. *See* Ex. 23.

9

She described Dr. Liu as "hard to understand. His English is hard to understand. He did not speak to me. He spoke directly to my husband even though I was the patient, and he did this for many months…" Tr. at 36. When Petitioner told Dr. Liu about her experience in the shower, she told him it felt like an electric jolt in her arms. *Id.* at 32. She described this as a new experience but clarified that she did not tell Dr. Liu this was when everything started. *Id.* Further, she affirmed during her testimony that at her March 14, 2015 appointment with Dr. Liu, she told him her symptoms started in October. *Id.* at 42. See Ex. 3 at 777. She told him that "[b]ecause during this time, he kept referring back to – he kept talking about December, and I was like – I told him – he said your symptoms started – and I said no, they started in October. They were worsening in December." Tr. at 43.

Petitioner testified that the medical records from her visit with Dr. Levin in June of 2016 are generally accurate (they indicate onset in October 2015), however, they are inaccurate in that they note that symptoms in her legs started before those in her hands. Tr. at 44. Petitioner does not know why this chronology was reversed. *Id*.

## 2. **Testimony of Ms. Sherry McCullough**

Ms. Sherry McCullough testified that Petitioner is her best friend and that they have known each other for at least 10 years. Tr. at 88. According to Ms. McCullough, Petitioner first mentioned having numbness and a tingling sensation in her hands at the end of October 2015 when they went to see Petitioner's husband in the hospital. *Id.* at 89-90. Petitioner told Ms. McCullough she thought she was experiencing carpal tunnel syndrome. *Id.* at 93.

Ms. McCullough described seeing a decline in Petitioner's physical health at Ms. McCullough's anniversary party on November 29, 2015. Tr. at 90. According to Ms. McCullough, Petitioner was having trouble getting up from a chair and opening her water bottle. *Id.* Petitioner had mentioned her physical difficulties before the party and expressed to Ms. McCullough that she was concerned about attending. *Id.* at 98.

Ms. McCullough testified that Petitioner told her about the difficulties she was having at work, to include walking up steps, falling outside of the office, and getting up from chairs. Tr. at 94-96.

Ms. McCullough described going to see a movie with Petitioner and Petitioner's husband on January 8, 2016. Tr. at 98-99. According to Ms. McCullough, Petitioner was nervous about her ability to get up from the seat due to her leg weakness. *Id.* at 99.

Ms. McCullough testified that she did not suggest Petitioner see a doctor. Tr. at 106. She stated she was aware Petitioner was already seeking treatment, so she did not bring it up.[6]

---

[6] Ms. McCullough testified that she recalled speaking with Petitioner about doctor's appointments that Petitioner attended in December. Tr. at 106-07. Petitioner did not attend any medical appointments in December. I have considered this evidence in arriving at my decision in this case. While I find it difficult to believe that Petitioner's best friend did not ever mention that Petitioner should go to see a doctor, Ms. McCullough's testimony did not outweigh the other evidence discussed in this ruling.

### 3. Testimony of Ms. Sarah Wolfe

Ms. Wolfe is Petitioner's supervisor at Adams County Healthy Families and they have worked together since 1999. Tr. at 113. Adams County Healthy Families is a division of North Adams Community Schools. *Id.* Petitioner has to make home visits to 15-22 families each month. *Id.* Ms. Wolfe testified that she and Petitioner meet one-on-one Wednesday mornings each week to discuss "what's happening with her clients, with her, and just any other issues that she might have." *Id.*

Ms. Wolfe testified that she first observed Petitioner appear to be weak in the mid-October timeframe. Tr. at 114. Ms. Wolfe stated that Petitioner began having trouble completing her paperwork and had difficulty typing due to issues with her hands. *Id.* at 114-15. Ms. Wolfe also noticed that it would take Petitioner longer to walk up the steps to the office during this timeframe. *Id.* at 116. Ms. Wolfe testified that she had to call maintenance to have a cement step installed outside the office. She believes the step was installed close-in-time to Thanksgiving, although she is not sure if it was before or after. *See Id.* at 116, 119.

Petitioner did have some issues completing paperwork before her vaccination. Tr. at 153. Ms. Wolfe made the distinction that Petitioner did not have a problem physically completing the work but fell behind due to the volume. *Id.*

Ms. Wolfe testified that Petitioner discussed the issues she was having with her hands before Mr. Eads' surgery in October. *Id.* at 120. Ms. Wolfe and Petitioner attributed these symptoms to carpal tunnel and stress. *Id.*

Ms. Wolfe testified about her weekly staff development notes that she took regarding Petitioner. During some of these meetings, Ms. Wolfe and Petitioner discussed Mr. Eads' upcoming surgery. Tr. at 123. Generally, the visits during October do not mention Petitioner's health problems, because Ms. Wolfe believed they were caused by the stress of her husband's hospitalization and near death. *Id.* at 134, 141. By November, Ms. Wolfe began noting issues with Petitioner's health because she became concerned it was attributable to more than stress. *Id.* at 134. Ms. Wolfe began recording Petitioner's physical deficits because they were affecting her work. *Id.* at 134-35.

Ms. Wolfe testified that around Christmastime, Petitioner fell outside of the office. Tr. at 137. Around this time and later, Ms. Wolfe observed a deep decline in Petitioner's daily functioning. *Id.* at 138.

### 4. Testimony of Ms. Chelsie Sharp

Ms. Chelsie Sharp is Petitioner's youngest daughter. Ms. Sharp was a nursing student and lived with her parents during the fall/winter 2015 timeframe. Tr. at 176. Ms. Sharp testified that she received her flu vaccine with her mother on September 26, 2015. *Id.* at 163. In October 2015 Ms. Sharp's father was having another cardiac ablation. *Id.* at 164. While they were in the hospital

together, Ms. Sharp and Petitioner discussed Petitioner's hands. Petitioner told Ms. Sharp that they were numb and tingling. *Id.* at 178.

During the fall timeframe, Petitioner would also ask Ms. Sharp to come into the bathroom and help button her (Petitioner's) pants. Tr. at 170. In the December timeframe, Ms. Sharp noticed that Petitioner was having difficulty at restaurants, specifically it was hard for her to get out of chairs. *Id.* at 172. This progressed, and Petitioner began having difficulty standing. *Id.* at 174.

Petitioner told Ms. Sharp that she waited to go to the doctor because there was so much happening in her personal life and because she assumed her symptoms would resolve on their own. Tr. at 173-74.

**IV. Legal Standards Regarding Fact Finding**

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves,

inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).  A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

## V. Findings of Fact

The issue to be addressed is when Petitioner's symptoms of numbness and tingling began. Petitioner has the burden of demonstrating the facts necessary for entitlement to an award by a preponderance of the evidence.  § 300aa-12(a)(1)(A).  Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring).   In light of the witness testimony, medical records, affidavits, and other documentary evidence presented in this case, and after my careful examination of the record as a whole, I find there is preponderant evidence that the onset of Petitioner's symptoms of hand numbness and tingling began on approximately October 21, 2015.

### A.  Inconsistency in the Medical Records

The medical records in this case are not internally consistent and contain numerous errors. Several of the records indicate that Petitioner developed symptoms of hand numbness and tingling in December of 2015. Specifically, in the records from January 13, 2016, Petitioner complained of numbness and tingling that began suddenly "three weeks ago." Ex. 2 at 15.[7]  Additionally, Petitioner's visit with Dr. Liu on January 20, 2016 reflects a "clear cut" onset of bilateral finger numbness, upper extremity numbness, and leg weakness on December 10, 2015. Ex. 3 at 65.[8]

---

[7] Of note, this one record from January 13, 2016 has several internal inconsistencies.  The record indicates that the numbness started eight months ago (the only medical record with this annotation).  It also states the symptoms have been "worse since December 2, 2015", and then goes on to indicate onset of symptoms was on December 12. *Compare* Ex. 2 at 15 and Ex. 2 at 16.

[8] This record also contains an error.  Under "Reason for Consultation" the record states, "Bilateral hand numbness started in 10/2015…" Ex. 3 at 65.  However, during Petitioner's next appointment, Dr. Liu noted

During Petitioner's appointment with Dr. Liu on February 2, 2016, Dr. Liu notes tingling and numbness in the arm and leg with later on weakness that started on 12/10/2015. Ex. 3 at 55. On March 30, 2016, Dr. Liu noted Petitioner's symptoms started in December 2015. Ex. 3 at 552. The records from Petitioner's follow-up with Dr. Liu on May 23, 2016 note that her symptoms started on December 10, 2016.[9] Ex. 3 at 13.

Other medical records note onset in October 2015. For example, during her medical appointment with Dr. Liu on March 14, 2016, the record notes Petitioner started to have "symptom[s] of weakness, 12/10/2015." Ex. 3 at 30. The record goes on to state, "[s]he was first seen by me on 01/20/2016. At that time, she had bilateral hand numbness and stated it started in 10/2015".[10] *Id.* The record further notes the decision to hold off on IVIG treatment "because it is 6 to 8 weeks beyond when the symptoms started, **even counting 12/10/2015, as the latest start**." Ex. 3 at 30 (emphasis added). In this record, Dr. Liu acknowledges the differing notations about onset in the language he uses regarding IVIG treatment. Dr. Liu thought IVIG was unnecessary because Petitioner had been experiencing symptoms for at least six weeks. At this time, Dr. Liu thought Petitioner had GBS, and that she would likely improve without treatment.

Another medical record that indicates Petitioner began experiencing symptoms of tingling and numbness in October 2015 is her medical appointment with Dr. Levin on June 10, 2016. Here, Petitioner described developing a feeling of weakness in the legs, followed by a sense of numbness in the fingertips in October 2015, several weeks after a flu vaccination. Ex. 4 at 6.

Ultimately, the medical records in this case conflict internally and with one another. Because of this lack of consistency, I have looked to other evidence presented to help resolve the issue of onset.

### B. Staff Development Notes and Family Home Visit Supervision Notes

#### 1. <u>Staff Development Notes</u>

Petitioner submitted her pre- and post-vaccination staff development notes for consideration in her case. These notes were completed by Petitioner's supervisor on a weekly

---

that her symptoms actually started on 12/10/2015 and that he "incidentally [sic] dictated the [sic] 10/2015 last time." *Id.* at 55.

[9] Although this is clearly a typo (since December 2016, at the time the record was created was a future date), the fact that this record contains another error further undermines the presumption of accuracy and regularity that contemporaneous medical records are typically afforded.

[10] It is unclear to me why the medical records shift back and forth between October 2015 and December 2015 when discussing onset. This visit in March indicates onset in October, while earlier <u>and later</u> visits indicate an onset in December. Specifically, that very same day when Petitioner was admitted to the hospital, the medical records indicate that Petitioner "started having symptoms of weakness, and numbness, mostly in bilateral hands, and stated it started in 10/2015, with subjective feeling of leg weakness. **At that point it was 6 weeks after the date by the time she was first seen by Dr. Liu."** (emphasis added) Ex. 3 at 552. It is unclear whether this is a typo (six weeks before Dr. Liu's appointment was December 9, 2015), or whether it is actually assuming onset of symptoms in December 2015.

basis. On November 18, 2015, Ms. Wolfe wrote "she has a lot going on … Doug's [heart] surgery. FSS [Petitioner] has also not been feeling well where sup[ervisor] helped FSS enter some data because she's struggling." Ex. 20 at 10. This note makes it clear that Petitioner had been experiencing symptoms to such a degree that Ms. Wolfe needed to help her complete paperwork. Petitioner testified that her symptoms started in October 2015 and got progressively worse. Initially, she was able to do her job, but as the symptoms continued to increase in severity, she needed help from her supervisor. On November 18, 2015, as documented in this note, Ms. Wolfe needed to step in and help Petitioner. The November 18, 2015 staff development note is consistent with Petitioner's testimony and supports an onset of Petitioner's symptoms in October as opposed to December of 2015.

On December 9, 2015, Ms. Wolfe wrote, "Sup[ervisor] coached FSS to 'hang in there' and go to dr. if still not fully well? FSS knows she needs to go". Ex. 20 at 7. This note makes it clear that Petitioner had been experiencing symptoms for some undetermined amount of time before this meeting. Of note, this entry contradicts Dr. Liu's assertion that Petitioner had a "clear-cut" onset of symptoms on December 10, 2015 since this staff development note preceded that date of purported onset. Ex. 3 at 65.

### 2. Family Home Visit Supervision Notes

The family home supervision notes are records completed by Ms. Wolfe that pertain to specific home visits performed by her subordinates. A record from home visits conducted by Petitioner on October 20, 2015 and November 12, 2015 states, in pertinent part, "FSS had difficulty getting off floor after administration of tool worried about weakness in legs … Sup[ervisor] asked if she was feeling okay! FSS concerned about progressive leg weakness??" Ex. 25 at 1. This note is consistent with Petitioner's testimony during the hearing where she described coming back to work on November 7, 2015 and having difficulties. *See* Tr. at 19. Specifically, she testified:

> I went to a home visit, and it was the week before Thanksgiving, and the family was putting up their Christmas tree. I was down on the floor doing the activity with their child, and I could not get up, and they had to help me get up, which was very difficult…"

*Id.* at 19-20. Based on the family home supervision notes, it is unclear whether Petitioner's difficulty getting off the floor took place on October 20, 2015 or November 12, 2015. When these notes are viewed in conjunction with the testimony, I believe it is more likely than not that Petitioner's testimony referred to the home visit on November 12, 2015, which is one of the home visits that is the subject of Ex. 25 at 1.[11] This family home supervision note corroborates Petitioner's testimony, and further establishes that Petitioner experienced symptoms before December 2015.

In her affidavits and during her testimony at the hearing, Petitioner attests that she experienced hand numbness and tingling in the week before her husband was admitted to the hospital for his heart surgery on October 28, 2015. I find her testimony on this point to be credible,

---

[11] I find this to be true even though the visit was two weeks (and not one week) before Thanksgiving (Thanksgiving was on November 26th in 2015).

and further find this testimony is corroborated by the staff development notes from November 18 and December 9, 2015, the family home visit supervision notes from November 12, 2015, her medical appointment with Dr. Liu on March 14, 2016 where she described bilateral hand numbness which began in October of 2015 (Ex. 3 at 30), as well as her medical appointment with Dr. Levin on June 10, 2016 where she described developing a feeling of weakness in the legs, followed by a sense of numbness in the fingertips in October 2015, several weeks after a flu vaccination (Ex. 4 at 6).

## VI. Conclusion

I find that the affidavits submitted by and on behalf of Petitioner, the testimony, the medical records, and the other documentary evidence work in concert to provide preponderant evidence that Petitioner's numbness and tingling in her hands began on approximately October 21, 2015.

The following is therefore ORDERED:

By no later than August 26, 2019, Petitioner and Respondent shall file a joint status report updating me on their proposed next steps in the case based on the facts articulated in this ruling.

**IT IS SO ORDERED.**

<u>s/Katherine E. Oler</u>
Katherine E. Oler
Special Master